## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

─────────────────────────────────────────────

AMY LYNN L.,

                                  Plaintiff,

      v.                                       5:20-CV-833
                                                     (ATB)

COMMISSIONER OF THE SOCIAL SECURITY
ADMINISTRATION,

                                Defendant.

─────────────────────────────────────────────

SARAH E. RUHLEN, ESQ., for Plaintiff
CANDACE LAWRENCE, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

### MEMORANDUM DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 7).

## I.    PROCEDURAL HISTORY

On February 22, 2017, plaintiff protectively filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging that she became disabled on August 1, 2013. (Administrative Transcript ("T") at 72-75). Her applications were denied initially on May 19, 2017. (T. 72-99).  At plaintiff's request, Administrative Law Judge ("ALJ") David Romeo conducted a hearing on November 7, 2018, at which plaintiff and Vocational expert ("VE") David Festa testified. (T. 34-71).  On January 3, 2019, ALJ Romeo issued an unfavorable decision.

(T. 10-23).  The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on May 28, 2020. (T. 1-5).

## II.   GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such  severity that he is not only unable to do his previous work but  cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hire if he applied for work

42 U.S.C. § 1382(a)(3)(B).  The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the

2

> [Commissioner] will consider him disabled with-out considering vocational factors such as age, education, and work experience… Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review, "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d

255, 258 (2d Cir. 1988).  However, a reviewing court may not substitute its

interpretation of the administrative record for that of the Commissioner, if the record

contains substantial support for the ALJ's decision. *Id. See also Rutherford v.*

*Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence

in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles*

*v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an

ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the

ALJ cannot "pick and choose evidence in the record that supports his conclusions."

*Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-

CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III.   <u>FACTS</u>

Plaintiff was born on February 11, 1992 and was 21 years old on her alleged

onset date. (T. 72).  During her hearing, plaintiff testified that she lived at home with

her parents and her twin brother. (T. 38).  Plaintiff has a General Equivalency Diploma

("GED") and has prior work experience as a cook at McDonald's, a job that she held

for "about five years." (T. 41).  Plaintiff testified that she stopped working at

McDonald's in 2013 because she could not work more than three hours because of her

back. (T. 41-42).  She also stated that she subsequently worked for one day at a "Mini-

Mart," but that she could not do it because of her anxiety. (T. 42).

Plaintiff testified that she could only stand for ten or twenty minutes before she

had to stretch or lean over, and she could only sit for approximately five minutes before

she had to "move around" or "shift in [her] chair." (T. 43-44).  Plaintiff also testified

that she had recently been diagnosed with "cyclic vomiting syndrome," and that she

never knew when she would have to vomit. (T. 44-45).  Plaintiff stated that she was

going through some additional testing for the condition. (T. 45).

Plaintiff stated that her anxiety also kept her from working. (T. 46).  Plaintiff

testified that when she started working for McDonald's, she quit after the first day and

was only able to go back to work when she was assigned to a cooking station where she

did not have to work with customers.[1] (T. 46).  Plaintiff stated that her hands got so

shaky that she could not sign her name or use the register. (T. 46).  Plaintiff stated that

her heart raced, and if she became too anxious, she could get sick. (*Id.*)  Plaintiff

testified that she stopped working due to the combination of her impairments. (*Id.*)

Plaintiff testified that she even had trouble when she was working at the grill. (T.

47).  She stated that sometimes, she would have to "go sit down or go throw up, or

whatever." (*Id.*)  Plaintiff stated that, if she got too hot, she would get sick, standing at

the grill bothered her back, and she would ask co-workers to help her lift things,

although, at the hearing, she had no idea how much she could lift. (*Id.*)  Plaintiff

testified that, even though she worked at McDonald's for five years, she was anxious

about going to work, because she might not be able to do her job, without pain or

vomiting. (T. 49).

Plaintiff testified that another symptom of her anxiety was paranoia. (T. 50).  She

---

[1] Plaintiff's brother worked at the same McDonald's and convinced plaintiff that she should call the manager and offer to work in the grill area where she would not have contact with the public. (T. 47).

stated that she had to leave a "pretty expensive concert" in Ohio because she thought some young people were talking about her. (*Id.*)  Plaintiff stated that she often had to leave a place because she thought people were talking about her, "but [she could] stick through it sometimes." (*Id.*)  Plaintiff testified that she had trouble looking people in the eye and had panic attacks five times per month, sometimes, even waking up with a panic attack. (T. 51).  Being in a crowded place or having an argument could trigger an attack.  When she was having an attack, she could not focus on any task that she was doing at the time because she paced, had racing thoughts, had difficulty breathing, and could get sick. (*Id.*)  Plaintiff takes medicine for these attacks, but it takes an hour for the medication to take effect. (T. 51-52).

Plaintiff also testified that she suffers from depression. (T. 52).  Plaintiff testified that when she is depressed, she has a hard time focusing on tasks, and at least once per week, she cannot get out of bed. (T. 53).  However, she appeared to state that the cyclic vomiting syndrome contributed to the exhaustion and was part of the reason that she could not get out of bed. (*Id.*)

Plaintiff stated that nothing helps the pain from her scoliosis. (T. 54).  She just has to "deal with it," stretch, and move around. (*Id.*)  She cannot sit, stand, or walk "too long." (*Id.*)  Plaintiff testified that, if she walked more than one block, she would start to have pain, would limp, and would have to rest for about one minute before she started walking again. (*Id.*)  Plaintiff testified that she took medications for her impairments, but she had "a bunch" of side effects as a result. (T. 55).  Plaintiff stated that a lot of the medications have "stomach warnings." (*Id.*)  "A few of them" made her

dizzy, and that she gets dizzy "randomly." (*Id.*)  Two of her medications made her "sleepy."[2] (*Id.*)

Plaintiff testified that on a "typical day," she got out of bed at 4:00 p.m. (T. 56). Plaintiff stated that after she got out of bed, she sat on the couch, watched television, and talked with her family. (*Id.*)  Plaintiff stated that she did not shower every day because she was not going anywhere, and she did not eat regularly. (*Id.*)  Plaintiff tried to help with the dishes, but she had to take a break every ten minutes. (T. 56-57).  She did not grocery shop because she could not walk that much, and she did not like being around people. (T. 57).  Plaintiff testified that she did not read or use the computer because she had trouble concentrating, and she was not "book smart." (T. 57).  Plaintiff stated that her mother helped her fill out forms. (T. 58).  Plaintiff also testified that she did not sleep well, and it took her hours to fall asleep because her thoughts kept her awake. (*Id.*)

Plaintiff testified that she would have good days and bad days. (T. 59).  On good days, she was able to go out and socialize with her friends and "be happy."  Plaintiff estimated that she had two weeks of good days in one month, but had not had any good days at the time of the hearing because she had been sick all month. (*Id.*)  Plaintiff had two cats, but her family helped to take care of them. (T. 59-60).  Plaintiff smoked two cigarettes per day and drank alcohol occasionally with friends if she was having a "good day." (T. 60).  Plaintiff testified that she stopped using marijuana in April of 2018 because she was told that quitting might help relieve her nausea. (T. 60-61).

---

[2] These two medications were Xanax for her anxiety and her muscle relaxer, Tizanidine. (T. 55).

Plaintiff testified that she owned a cell phone and occasionally texted a girlfriend. (T. 61). She used "Google," but did not have any social media accounts. (*Id.*) Plaintiff first stated that she had not eaten in a restaurant in "the last month or two," but then answered "maybe." (T. 63). She ultimately stated that she ate at a restaurant twice in the last six months at the "casino." (*Id.*) However, she stated that she had been to the casino three times in the last six months. While she was at the casino, she spoke with her mother and brother while her father would go to gamble, and on a good day, she brought a friend. (*Id.*)

Plaintiff testified that the concert she left was "a long time ago," and that the most recent event that she left because of her anxiety was the "Taste of Syracuse" in "East Syracuse." (T. 63). She stated that she was so anxious that she walked approximately one mile to her home from the event, even though she had driven with her parents and a friend to get there. (*Id.*) She stated that she was in excruciating pain by the time that she got home. (*Id.*) Plaintiff also initially denied going to the "mall," but then testified that she went to a movie. (T. 63-64). But, she stated that the "mall" was "pretty much abandoned." (T. 64).

The ALJ took testimony from VE David Festa. The judge asked VE Festa a hypothetical question about an individual with plaintiff's limitations. (T. 65-66). The VE was asked to assume an individual of plaintiff's age, education, and no relevant previous work experience. (*Id.*) The ALJ added the following limitations: light exertion, can tolerate a low level of work pressure, which means that the work does not require "multitasking, detailed job tasks, significant independent judgment, very short

deadlines, team work in completing job tasks, or more than occasional changes in work settings . . . ." (T. 65). The ALJ further specified that the individual could tolerate "occasional" interaction with coworkers and supervisors, but could have no interaction with the public. (T. 66). The individual would require "ready access to the restroom, if the need to use the restroom can be accommodated by the 15-minute morning and afternoon breaks, . . . the 30-minute lunch period, and two additional 10-minute breaks." (*Id.*)

The VE testified that there would be jobs available, notwithstanding those restrictions. (T. 66). He named three representative unskilled light work jobs: cleaner/housekeeping; photocopying machine operator, and order caller. (*Id.*) The VE testified that his testimony was consistent with the Dictionary of Occupational Titles and his own experiences regarding the two additional 10-minute breaks. (T. 66-67). The ALJ then asked the VE to assume that plaintiff was limited to sedentary work, with all the other limitations that the ALJ proposed. (T. 67). In addition, with the sedentary job, the plaintiff would have to be able to stand for two minutes after every thirty minutes of sitting, but could remain on task while standing. (*Id.*) The VE testified that even with the sedentary level of work, including the additional limitations, plaintiff would still be able to perform substantial gainful activity. (*Id.*) He named the following unskilled sedentary jobs: addresser, document preparer, and table worker. (T. 67-68).

The VE stated that, if the individual could not focus on her tasks for greater than 30 minutes due to anxiety or would be absent more than four or more times per month, she would not be able to engage in substantial gainful activity. (T. 68). The VE

9

testified that an employer would not tolerate an individual being off-task more than 10% of the day and would not tolerate more than one unexcused absence per month. (*Id.*)

The parties have summarized the medical evidence in their briefs. (Dkt. Nos. 11, 13).  In addition, there are a substantial number of relevant medical records in the file. Rather than discussing the medical records at the outset, I will refer to the pertinent records during my analysis of the plaintiff's arguments.

## IV.  **THE ALJ'S DECISION**

At step one of the sequential evaluation, the ALJ found that plaintiff has not engaged in substantial gainful activity since her alleged onset date of August 1, 2013. (T. 12).  At step two of the evaluation, the ALJ found that plaintiff suffers from the following severe impairments: scoliosis with back pain, gastroesophageal reflux disease ("GERD") with chronic nausea and vomiting, obesity, major depressive disorder - recurrent moderate, general anxiety disorder ("GAD"), and panic disorder. (T. 12-14). The ALJ also found that plaintiff's hypertension, tobacco abuse, fatty liver, diabetes, ankle injury, and headaches were not severe. (T. 13-14).

At step three of the evaluation, the ALJ found that plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of a listed impairment. (T. 14-15).  In making this determination, the ALJ considered Listings 1.04 (Disorders of the Spine); 5.00 (Digestive Listings); 12.04 (Depressive, Bipolar, and Related Disorders); and 12.06 (Anxiety and Obsessive Compulsive Disorders). (*Id.*)

At step four of the evaluation, the ALJ found that plaintiff has the capacity to perform light work with additional limitations: she can tolerate a low level of work pressure, which is defined as work not requiring multi-tasking, detailed job tasks, significant independent judgment, very short deadlines, teamwork in completing job tasks, and more than occasional changes in the work setting. (T. 15).  Plaintiff could tolerate "occasional" interaction with co-workers and supervisors, but should have "no" interaction with the public. (*Id.*)  The plaintiff must also have ready access to a bathroom, "but the need to use the bathroom can be accommodated by the 15 minute morning and afternoon breaks and the 30 minute lunch period ***and 2 additional 10 minute breaks***." (T. 15-16) (emphasis added).

In determining the above RFC, the ALJ reviewed and weighed the medical evidence regarding each of the plaintiff's severe impairments and also determining that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence of record. (T. 16).  The ALJ stated with respect to her physical impairments "the diagnostic studies, clinical findings during exams, . . . treatment history, and the claimants activities of daily living do not support the claimant's allegations regarding the severity of her conditions and suggest that she retains the ability to meet the exertional demands of light work on a sustained basis." (T. 18).  With respect to her mental impairments, the ALJ determined that "the clinical findings . . . suggest that despite her allegations of major depressive disorder, general anxiety disorder, and panic disorder, the claimant has no significant mental limitations." (T. 19).

The ALJ found that plaintiff had no past relevant work, and based on the above RFC and the testimony of VE Festa, the ALJ determined at step 5 that plaintiff could perform jobs which existed in significant numbers in the national economy. (T. 22).

## V.   ISSUES IN CONTENTION

Plaintiff raises the following arguments in support of her position that the ALJ's decision is not supported by substantial evidence:

1.   The ALJ did not properly weigh the evidence. (Pl.'s Br. at 16-23, Point I-Point VI) (Dkt. No. 11).

2.   The ALJ's credibility determination was not supported by substantial evidence. (Pl.'s Br. at 23-24, Point VII).

3.   Plaintiff is entitled to an award of benefits. (Pl.'s Br. at 24-25, Point VIII).

Defendant argues that the Commissioner's decision is supported by substantial evidence. (Defendant's Brief ("Def.'s Br.") at 10-25) (Dkt. No. 13).  For the following reasons, this court agrees with the defendant and will affirm the Commissioner's decision.

## VI.   RFC/Weight of the Evidence

### A.   Legal Standards

#### 1.   RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2

12

(N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence.  *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

### 2.      Weight of the Evidence

In making a disability determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996).  Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings."  The responsibility for determining these issues belongs to the Commissioner.  *See* SSR 96-5p, 1996 WL 374183, at *2.  These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d).  The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered.  *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

The regulations regarding the evaluation of medical evidence were amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded.  According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion."  Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a),

416.920c(a).  Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors."  20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Under the regulations applicable to individuals filing before March 27, 2017, the ALJ's analysis was subject to the "treating physician rule."  "Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ."  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  If an ALJ decides not to give the treating source's records controlling weight, then he must explicitly consider the four *Burgess* factors: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (quoting *Burgess v. Astrue*, 537 F. 3d 117, 120 (2d Cir. 2008)).  "[T]he ALJ must 'give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion.' " *Id.* at 96 (citing *Halloran v. Barnhart*, 362 F.3d at 32).  Should an ALJ assign less than controlling weight to a treating physician's opinion and fail to consider the above-mentioned factors, this is a procedural error.  *Id.*  It is impossible to conclude that the

error is harmless unless a "searching review of the record . . . assures us that the substance of the treating physician rule was not traversed." *Id.*

For claims filed prior to March 27, 2017, the Social Security Administration categorized nurse practitioners as "other medical sources," whose opinion may be considered as to the severity of a claimant's impairment and ability to work, but who are not necessarily entitled to the weight afforded to a treating physician. 20 C.F.R. §§ 416.913(d)(1), 404.1513(d)(1).[3]  The regulations direct an ALJ to use various factors in evaluating the opinions of these "other medical sources," including frequency of treatment, consistency with other evidence, degree of supporting evidence, thoroughness of explanation, and whether the source has an area of expertise. 20 C.F.R. §§ 404.1527(c) and (f), 416.927(c) and (f).[4]  The Second Circuit has stated that "'the ALJ has discretion to determine the appropriate weight to accord [the other source's] opinion based on all the evidence before him." *House v. Comm'r of Soc. Sec.*, 32 F. Supp. 3d 138, 151 (N.D.N.Y. 2012) (quoting *Diaz v. Shalala,* 59 F. 3d 307, 313–14 (2d Cir. 1995)) (some alterations in original).

---

[3] The current version of these regulations (applicable to cases filed after March 27, 2017) no longer differentiates between "acceptable" and "other" medical sources.  The sections are entitled "Categories of Evidence," and define the differences between objective medical evidence, medical opinion, "other medical evidence," and evidence from non-medical sources.  The evaluation of opinion evidence for claims filed prior to March 27, 2017 is now located at 20 C.F.R. § 404.1527 and 416.927 and does refer to acceptable versus other sources.

[4] The new regulations now contain separate sections for claims filed prior to, and after, March 27, 2017.  As stated above, sections 404.1527 and 416.927 contain the regulations for cases filed prior to March 27, 2017.  In sections 404.1527(f)(1) and 416.927(f)(1), the regulations refer to 404.1527(c)(1)-(c)(6) and 416.927(c)(1)-(c)(6) which contain the specific factors by which the Commissioner evaluates "acceptable medical sources," but states that "not every factor for weighing opinion evidence will apply in every case because the evaluation of an opinion from a medical source who is not an acceptable medical source or from a nonmedical source depends on the particular facts in each case." *Id.*

16

**B.    Analysis**

The court must first determine which regulations are applicable to the ALJ's analysis of plaintiff's claims.  Plaintiff assumes that the post-March 27, 2017 regulations ("the new regulations") apply.[5]  Because plaintiff assumes that the new regulations apply, she argues, inter alia, that the ALJ erred in stating that plaintiff's nurse practitioner was not an "acceptable medical source." (Pl.'s Br. at 22).  Defendant argues that the pre-March 27, 2017 regulations apply because, even though plaintiff's formal application for benefits was filed on March 28, 2017 (T. 198), plaintiff's "protective filing date" of February 22, 2017 is the date that Social Security considers the application's filing date. (*See* T. 72) ("Filing Date" listed as February 22, 2017 in "Disability Determination and Transmittal" form).

The Commissioner is correct.  The Social Security Programs Manual Operational System ("POMS") specifically states that if a proper application is subsequently filed, "the protective filing date is the application filing date." POMS - GN00204.010(A)(3).  Thus, this plaintiff's application date is February 22, 2017, and the pre-March 27, 2017 rules apply.  It is with these rules that the court must analyze plaintiff's arguments.[6]

**1.    Psychiatric Wellness Care ("PW") Providers McNally and Verma**

Plaintiff argues that the ALJ did not properly weigh the evidence provided by the providers at PW, plaintiff's treating psychiatric provider, particularly NP Tish McNally

---

[5] Plaintiff makes no argument relative to this proposition.  Plaintiff's brief simply begins with a statement of the law that is applicable to "claims filed after March 27, 2017 . . . ." (Pl.'s Br. at 16).

[6] The plaintiff couches all of her arguments in terms of the "new rules."  While many of the considerations under the pre-March 27, 2017 rules and the new rules are the same, the court has had to adjust its analysis slightly in order to apply the proper standards.

and Psychiatrist Anil Verma. (Pl.'s Br. at 16-17).  First, plaintiff argues that the ALJ failed to address the "supportability" of the records under the new rules.

The defendant concedes that the ALJ did not use the term "supportability" in his decision.  As stated above, the new rules do not apply to plaintiff's application, and the ALJ did not commit an "error of law" by failing to use the new rules.  However, even though the ALJ need not use the term "supportability," the ALJ must still properly consider the relevant evidence and discuss the weight that he gave to the medical opinions, and the court must determine whether the Commissioner's decision is supported by substantial evidence.

The transcript contains records from PW, beginning on January 2, 2013, prior to plaintiff's alleged date of onset in August of 2013. (T. 341).  At that time, plaintiff was seeing NP Bonita Sperato, who saw plaintiff until May 2, 2013, when plaintiff began seeing NP Harry F. Cowart, Jr. (T. 341-43).  Plaintiff saw NP Cowart through January 15, 2014 and began seeing NP Tish McNally on March 19, 2014.[7] (T. 349).  In her first progress note, NP McNally stated that she would refer plaintiff to psychiatrist Dr. Anil K. Verma, M.D., who plaintiff began seeing on May 7, 2014. (T. 351).

Plaintiff had ten visits with Dr. Verma from May 7, 2014 until June 7, 2016. (T. 351-62).  Plaintiff started seeing NP McNally again on August 4, 2016. (T. 363-65, 432-35).  The last treatment note from NP McNally is dated May 23, 2018. (T. 434-35).  On August 23, 2018, NP McNally completed a "Mental Impairment Questionnaire (Listings)." (T. 508-511).  In this questionnaire, NP McNally indicated that plaintiff

---

[7] Plaintiff appointments saw the PW providers once every two months. (*See e.g.* T. 341-49).

was taking Cymbalta and Xanax with "moderate benefits." (T. 508).  She stated that the medications caused "fatigue." (*Id.*)  NP McNally reported that the "severity" of plaintiff's mental impairment was demonstrated by "severe anxiety that causes impairment in daily function"; inability to leave her home to perform "ADLs" unless accompanied; trembling voice; hands shaking; "↓focus and concentration;" and daily panic attacks. (T. 508).  NP McNally listed plaintiff's prognosis as "fair." (*Id.*)

NP McNally was asked to "identify [her] patient's signs and symptoms." (T. 509).  She checked a variety of symptoms that plaintiff exhibited, including decreased energy; persistent anxiety; motor tension; emotional lability; mood disturbance; difficulty thinking or concentrating; psychomotor agitation or retardation; persistent disturbance of mood or affect; apprehensive expectation; emotional withdrawal or isolation; sleep disturbance; "psychological or behavioral abnormalities associated with a dysfunction of the brain with a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities"; persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the object, activity, or situation; recurrent panic attacks; and a history of multiple physical symptoms for which there are no organic findings, of several years duration beginning before age 30 and causing the individual to take medication frequently, see a physician often, or alter life patterns significantly. (T. 509).

NP McNally also stated that plaintiff's physical pain increased her anxiety and her limitations. (T. 510).  NP McNally opined that plaintiff would have "marked"

restrictions in her activities of daily living and in maintaining social functioning and "extreme" restrictions in maintaining concentration, persistence, and pace. (*Id.*)  NP McNally also stated that plaintiff had one or two "episodes of decompensation" during a twelve month period, each lasting at least two weeks. (*Id.*)  Although dates were requested for these alleged episodes of decompensation, none were listed by NP McNally.

NP McNally checked a box indicating that plaintiff had a "residual disease process" that has resulted in such a marginal adjustment that even a minimal increase in mental demands or changes in the environment would cause the individual to decompensate. (T. 511).  NP McNally checked another box indicating that plaintiff had a current history of one or more years of "inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement." (*Id.*)  NP McNally estimated that plaintiff's impairments would cause her to be absent from work for more than four days per month.  Finally, NP McNally stated that plaintiff would be unable to work due to poor focus and concentration and frequent panic attacks with any demands. (*Id.*)

Under the regulations applicable in plaintiff's case, as stated above, a nurse practitioner was considered under the category of "other medical sources," who was not afforded the controlling weight of a treating physician, but whose opinion must still be properly evaluated by considering the frequency of treatment, consistency with other evidence, degree of supporting evidence, thoroughness of explanation, and whether the source has an area of expertise–the same factors as those used for acceptable medical

sources.[8] *Michael S. v. Kijakazi*, No. 20-CV-6340, 2021 WL 2917694, at *3 (W.D.N.Y. July 12, 2021) (citing 20 C.F.R. § 416.927(c); *Pike v. Colvin*, No. 14-CV-159, 2015 U.S. Dist. LEXIS 35143 at *11, 2015 WL 1280484, at *5, 8 (W.D.N.Y. Mar. 20, 2015) (quotation and alterations omitted)).  "The ALJ 'does not have to explicitly walk through these factors,' so long as the court can conclude that the ALJ 'applied the substance' of the listed factors and provided 'good reasons' for the weight given to the medical source's opinion." *Pike*, 2015 WL 1280484, at *5. (quoting *Hall v. Colvin*, 37 F. Supp. 2d 614, 625 (W.D.N.Y. 2014)).

Contrary to plaintiff's argument, the ALJ did consider NP McNally's treating status.  In fact, the ALJ stated that NP McNally's opinion "is accorded some weight ***because she is a treating medical provider***.  However, she identified greater limitations that what is supported by the record, ***and*** she is not an acceptable medical source." (T. 20) (emphasis added).  The ALJ stated that the record also contained "notations" from Dr. Verma and NP McNally indicating that plaintiff was "not fit to work," but they were conclusory statements which did not include any function-by-function assessment of plaintiff's abilities. (T. 21).  Conclusory statements about plaintiff's "fitness" to work were given "no evidentiary weight." (*Id.*)  The "remainder" of Dr. Verma's and NP McNally's opinions indicating "extreme" limitations were "not consistent with the medical evidence" and were accorded "little weight." (*Id.*)

A review of the medical record shows that the ALJ's findings were supported by substantial evidence.  Plaintiff argues that NP McNally's and Dr. Verma's opinions are

---

[8]Thus, the ALJ did not commit an error of law in stating that NP McNally was not "an acceptable medical source."

consistent with the record and cites various PW records which allegedly support the marked and extreme limitations listed in the questionnaire. (Pl.'s Br. at 20-21).  Even in records where limitations are noted, other records, and even parts of the same mental status examinations are inconsistent with the **_extent_** of the alleged limitations.  The ALJ did not question that plaintiff had "severe" anxiety or other limitations that would impair her daily functioning.[9]  However, the ALJ found that the records did not support the "marked" or "extreme" limitations that NP McNally checked in her questionnaire.

Plaintiff cites progress notes in which she was found to have trembling hands, shaking, diminished focus and concentration, apprehensive expectation, panic attacks, disturbances of mood and affect, avoidance of activities and situations, emotional lability and sleep disturbance, and emotional withdrawal. (Pl.'s Br. at 19-20) (citing inter alia T. 346, 347, 349, 351, 352, 353, 360, 364, 365, 432, 433, 434).  However, even though on August 27, 2013, NP Cowart noted that plaintiff's speech was "anxious and rambling" and that she exhibited a "pattern of distractability in topics,"[10] NP Cowart also stated that plaintiff was pleasant, cooperative, showed up on time and maintained good eye contact throughout the interview. (T. 346).  NP Cowart also stated

---

[9] The definition of a severe impairment at step two of the sequential analysis is an impairment which "significantly limits [an individual's] physical or mental ability to do basic work activities." *See Stephens v. Colvin*, 200 F. Supp. 3d 349, 356 (N.D.N.Y. 2016) (citing 20 C.F.R. §§ 404.1520(c), 404.1521).  Basic work activities include the physical and mental abilities to perform work. *Id.*  Thus, a finding that the plaintiff has a severe mental impairment presumes that there are already significant limitations to her ability to perform the basic mental requirements of a job.

[10] This notation is one which plaintiff cites as showing her lack of focus and concentration. There is no specific reference to focus or concentration in this note, and the court assumes that plaintiff is referring to the "pattern of distractability," which appears in several notes, without further explanation. (T. 346).

22

that there were no reported side effects from her medications, and although plaintiff was experiencing some increased anxiety with work-related issues, her attitude and behavior were neutral, her motor activity was not abnormal, her affect exhibited a full range of negative and positive emotions, she was of average intelligence, exhibited good judgment, good insight, and did a good job of accepting ownership of behavioral functioning. (*Id.*)

On November 8, 2013, plaintiff was exhibiting more symptoms and noted that she stopped taking one of her medications because it was giving her suicidal thoughts. (T. 347). At that time, both depression and anxiety were present, and plaintiff's motor activity was "disorganized," her speech was anxious and rambling, and she exhibited a "pattern of distractability in topics." (*Id.*) However, plaintiff was pleasant and cooperative, showed up on time, and maintained good eye contact through the interview, along with having a full affect, good insight and good judgment. (*Id.*)

On January 15, 2014, after a change in medication, plaintiff reported that she had no side effects from her medication, "and [she felt the medications were] working well at controlling current symptoms." (T. 348). Plaintiff's attitude and behavior were neutral, her motor activity was no longer abnormal, and her speech appeared to be normal. (*Id.*) Her mood was congruent with the issues and circumstances of the evaluation. (*Id.*) Her affect was full,[11] and she had good judgment and good insight.

---

[11] The precise language of the note was that "[h]er affect exhibited a full range of both negative and positive emotions." (T. 348). Affect is the outward expression of feelings and emotions. https://study.com/academy/lesson/affect-in-psychology-definition-types.html. A "full," or "broad" affect indicates that the individual can express a wide variety of affects to display emotions, and is often associated with a psychologically healthy individual. *Id.*

(*Id.*)  There was no mention of distractability or lack of focus and concentration.

Plaintiff began treating with NP McNally on March 19, 2014. (T. 349).  On plaintiff's first visit, she told NP McNally that she was not depressed, but more anxious. (T. 349).  NP McNally's mental examination showed that plaintiff's appearance was normal, her behavior cooperative, "exhibiting the appearance of a positive attitude." (*Id.*)  Her motor activity "did not appear to be abnormal," her speech was normal, even though she reported being anxious and nervous about "a number of issues." (*Id.*)  Her affect was full, and she had good judgment and good insight.[12] (*Id.*)  NP McNally recommended that plaintiff see Dr. Verma. (T. 349).

On Wednesday May 7, 2014, Dr. Verma examined plaintiff for the first time and switched one of her medications to Xanax in order to address her panic attacks. (T. 351).  In the introductory paragraph, Dr. Verma made the conclusory statement that "due to anxiety, she is not fit to work," but there was no explanation of what specific limitations the anxiety would cause. (*Id.*)  The doctor stated that plaintiff was under a lot of stress over financial issues. (*Id.*)  In the paragraph entitled "Mental Status Exam Full," Dr. Verma stated that plaintiff's appearance was "normal," and she was cooperative "with the appearance of a positive attitude." (*Id.*)

Her motor activity did not appear to be abnormal, but her speech was anxious and rambling, and there was a "pattern of distractability in topics." (*Id.*)  Plaintiff was anxious and nervous about a number of things and was tearful.  Dr. Verma stated that

---

[12] The progress notes also indicated that plaintiff did not have suicidal or homicidal ideation, had no delusions, her thought content was non-delusional, and she did not report hallucinations. (T. 347-50).

plaintiff had short term memory problems commensurate with cognitive abilities, and she was highly distractable "to the point of having an impact on daily functioning." (*Id.*) However, Dr. Verma also found that plaintiff had good judgment, good insight, and did a good job of "accepting ownership of behavioral functioning." (*Id.*)

On July 3, 2014, plaintiff reported to Dr. Verma that the Xanax was helping. Dr. Verma increased the dosage to three pills per day, and noted that the plaintiff was anxious, nervous, and was concerned about her GI condition. (T. 352). Plaintiff had contacted an attorney about her Social Security Disability case. Dr. Verma stated that plaintiff was given a medical authorization form but was "so confused and didn't know what to do." (*Id.*) Plaintiff's mental exam was similar to the May 7th examination. (*Id.*)

On August 7, 2014, plaintiff told Dr. Verma that the Xanax was "definitely helping with anxiety." (T. 353). Plaintiff did complain of fine tremors secondary to a rise in anxiety. On her mental examination, the plaintiff showed tremors, but her speech was now listed as "normal," even though she was anxious and nervous about "a number of issues." (*Id.*) The rest of plaintiff's examination tracked the wording of the May and July progress notes. (*Id.*) On November 10, 2014, Dr. Verma reported that plaintiff was quiet and not reporting much. (T. 354). However, Dr. Verma also reported that plaintiff was "stable" on her medication, her appearance was normal, her motor activity did not appear to be abnormal, her speech appeared to be normal, and her mood was "congruent with the issues and the circumstances of the evaluation." (*Id.*) Her affect "exhibited a full range of negative and positive emotions." (*Id.*) She had average intelligence, good judgment, and good insight. (*Id.*)

On March 17, 2015, Dr. Verma's mental evaluation was the same.[13] (T. 355).

Plaintiff's motor activity and speech were normal, her affect was full, she had no

delusions or hallucinations, no tendency for self harm, no suicidal or homicidal

ideation, was of average intelligence, and had good insight and judgment. (*Id.*)

Although plaintiff reported have trouble sleeping on June 9, 2015, she was "doing well

on both medications," and her mental status examination was largely normal. (T. 355-

56).  On September 17, 2015, Dr. Verma prescribed Trazodone for sleep.[14] (T. 357).

Plaintiff's mental examination was again largely normal, although she did report being

anxious or nervous about a variety of issues. (T. 357).

On January 7, 2016, plaintiff was again complaining of anxiety, together with her

nausea and vomiting. (T. 357).  Dr. Verma stated that plaintiff met all the criteria of

GAD. (*Id.*)  Plaintiff's mental examination showed that she was anxious and nervous

about a "number of issues," and she appeared tearful, distressed, and highly

distractable. (*Id.*)  However, she still had good insight, good judgment, and did a good

job of accepting ownership of her behavioral function. (T. 358).  On March 7, 2016, Dr.

Verma readjusted plaintiff's medication and noted that plaintiff's problems with

insomnia did not affect her functioning. (T. 358).  Her anxiety and depression were the

same, and her mental status examination was similar to January 7. (T. 359).

On June 6, 2016, during her last visit with Dr. Verma, plaintiff stated that she

was "happy" with the new combination of medications, and that Dr. Verma "'was the

---

[13] The court notes that on January 4, 2015, plaintiff "denied psychiatric symptoms" during a
visit with her primary care provider. (T. 422).

[14] A suggested sleep study had to be cancelled for financial reasons. (T. 356-57).

only one who fixed my anxiety, depression, and stomach upset.'" (T. 361).  Her mental examination was normal. (*Id.*)  Dr. Verma listed plaintiff's "current diagnosis" as GAD, Panic Disorder without Agoraphobia, and Major Depressive Disorder Recurrent Moderate. (T. 362).  Thus, while Dr. Verma's initial evaluation made the conclusory assessment that plaintiff was "not fit to work," by the doctor's last progress note, plaintiff's symptoms appeared to be significantly better, and more consistent with the moderate restrictions ultimately found by the ALJ in his RFC determination.

Plaintiff began seeing NP McNally again on August 4, 2016. (T. 363).  NP McNally stated that plaintiff was "doing well on her current meds." (*Id.*)  NP McNally commented that plaintiff was "going on vacation soon" and needed her medications refilled. (*Id.*)  She noted that plaintiff awakened with anxiety, her life was "in flux" and she "looked anxious, communicative." (*Id.*)  Plaintiff had the same "clinical diagnoses" listed above, and her mental examination was normal. (*Id.*)

On October 7, 2016, NP McNally reported that plaintiff was "able to relax" on her two-week vacation in August, however, she was very anxious otherwise, which affected her GI issues. (T. 364).  Plaintiff had a panic attack, knowing that she had the appointment, hated driving, and was shaking, flushed, and had moist skin during the appointment.  However, she told NP McNally that she "is not this anxious every day." (*Id.*)  Plaintiff told NP McNally that she tried to work at a "cashier's job," for one day but could not manage it. (*Id.*)  NP McNally conducted a mental examination, finding that plaintiff was cooperative and exhibited "the appearance of a positive attitude."  Her motor activity was normal, but her speech was anxious and rambling, and she exhibited

a "pattern of distractability." (*Id.*)  Her affect was full, and her mood was "congruent with the issues and circumstances of the evaluation." (*Id.*)

On February 15, 2017, NP McNally noted that plaintiff "feels her anxiety prevents her from working." (T. 365).  She also noted plaintiff's diagnosis of "cyclonic [sic] vomiting syndrome" which made her sick for two weeks in a row. (*Id.*)  Plaintiff's diagnosis was the same as above.  Plaintiff's speech was anxious and rambling, and she showed a pattern of distractability, but the remainder of the examination produced mostly normal results. (*Id.*)

In April of 2017, plaintiff underwent a consultative mental examination by Dr. Jeanne Shapiro, Ph.D. (T. 370-74).  Plaintiff told Dr. Shapiro that she got anxious about "everything" and that she had panic attacks daily over "anything," and that she was only able to work at McDonald's for four years because her brother worked with her. (T. 371).  Plaintiff stated that her heart would beat fast, she became nauseated, got shaky, could not sit still, and was unable to breathe.  She told Dr. Shapiro that she did not go out alone.  She consistently thought that people are talking about her, which made her angry, and when that happened, she would leave the room.  Plaintiff told Dr. Shapiro that she was depressed about her life and was sad all the time.

Plaintiff told Dr. Shapiro that her memory was "iffy." (*Id.*)  She also told Dr. Shapiro that she did not do anything, and the most she could do was sit at a friend's house.  Dr. Shapiro noted that, at times, it was difficult to get information from the plaintiff because she was "frustrated" and believed that Dr. Shapiro was asking too many questions. (*Id.*)  Dr. Shapiro found that plaintiff was "marginally cooperative,"

her manner of relating was marginally adequate, her motor behavior was normal, and her eye contact was adequate. (T. 372).  Her speech intelligibility was fluent, the quality of her voice was clear, and her motor behavior was normal. (*Id.*)  Her thought processes were coherent.  However, her affect was "constricted," being "somewhat reduced in intensity given her thoughts and speech." (*Id.*)  During the examination, plaintiff reported feeling anxious, and she was tense and apprehensive. (*Id.*)  However, her attention, concentration, and her memory were "intact." (*Id.*)

Dr. Shapiro stated that the results of the mental examination were not consistent with the plaintiff's academic and vocational history because she could not answer "simple information questions."[15] (T. 373).  There were no neurocognitive events, psychoses, or other difficulties which would account for this inconsistency, other than her psychiatric symptoms. (*Id.*)

Dr. Shapiro concluded that plaintiff had no limitation in understanding, remembering or applying simple directions and instructions; mild limitations in understanding, remembering, or applying complex directions and instructions; and mild limitations using reasoning and judgment to make work-related decisions. (T. 373). Plaintiff had moderate limitations interacting adequately with supervisors, co-workers, and the public; and mild to moderate limitations in sustaining concentration and performing a task at a consistent pace depending on her level of anxiety. (*Id.*)  Plaintiff

---

[15] Although the ALJ did not specify what simple questions plaintiff was unable to answer, earlier in the "cognitive" section of the mental status examination, Dr. Shapiro stated that plaintiff did not know in what direction the sun rose or how many weeks there were in one year. (T. 373).  This resulted in Dr. Shapiro finding that plaintiff's intellectual functioning was in the "deficient" range, and that her fund of information was "somewhat limited." (*Id.*)

had moderate limitations in sustaining an ordinary routine and regular attendance at work; and mild to moderate limitations regulating emotions, controlling behavior, and maintaining well-being. (*Id.*)  Dr. Shapiro stated that plaintiff appeared to have no limitations maintaining personal hygiene and wearing appropriate attire, and appeared to have no limitations being aware of normal hazards and taking appropriate precautions. (T. 373-74).  Dr. Shapiro stated that plaintiff's prognosis was "guarded," given that she had not made much progress after years of treatment. (T. 374).

On May 1, 2017, non-examining State Agency Psychological Consultant, Tammy Inman-Dundon, Ph.D. reviewed the medical records, including Dr. Shapiro's report and the PW records, citing to both the PW records and Dr. Shapiro's report in her evaluation. (T. 82-93, 90).  Dr. Inman-Dundon opined that plaintiff had moderate limitations in her ability to interact with others, concentrate, persist, or maintain pace, and in adapting or managing herself. (T. 89-90).  She opined that plaintiff had no limitations in her ability to understand, remember, and apply information. (T. 89).  Her ability to perform activities within a schedule, maintain regular attendance, and be punctual was moderately limited. (T. 89).  Ultimately, Dr. Dundon determined that plaintiff could perform unskilled work. (T. 91).

Although plaintiff argues that the ALJ did not properly analyze her treating source reports, the ALJ carefully examined all the evidence and found that Dr. Shapiro's report and Dr. Inman-Dundon's RFC evaluations were more consistent with the medical evidence of record, including her own treating sources.  Plaintiff essentially asks the court to redetermine the case.  However, conflicting evidence is is for the ALJ to

resolve, and it is not the court's province to reweigh the evidence. *Sierra v. Saul*, No. 1:20-CV-127(GTS), 2020 WL 7316121, at *6 (N.D.N.Y. Dec. 11, 2020).  Where substantial evidence supports the plaintiff's account, but there is also substantial evidence from which the ALJ reasonably could have ruled against the plaintiff, the court must defer to the agency determination. *Barrere v. Saul*, No. 20-1102-CV, __ F. App'x __, 2021 WL 1590047, at *2 (2d Cir. Apr. 23, 2021). There is certainly conflicting evidence in this case, but the ALJ has not committed any errors of law that would require remand for further analysis.

While plaintiff's treating providers did observe some abnormal findings, there is substantial evidence supporting the mild/moderate limitations described by Dr. Shapiro and Dr. Iman-Dundon.  Plaintiff herself stated in a function report, dated April 17, 2017 that she had no trouble paying attention, could follow written and spoken instructions, and that she can finish tasks "sometimes if she is not in pain." (T. 226).  The ALJ accounted for the plaintiff's restrictions in the RFC determination.

Plaintiff argues that the ALJ afforded too much weight to the opinions of Dr. Shapiro and non-examining state agency consultant Dr. Inman-Dundon.  Plaintiff argues that Dr. Inman-Dundon did not have the opportunity to review NP McNally's medical source statement, and therefore, did not have all the evidence in the record. However, the ALJ is entitled to rely on the opinions of examining and non-examining consultants when their opinions are consistent with the record as a whole. *Frey ex rel. A.O. v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012). *See also Brenda Lynn S. v. Comm'r of Soc. Sec.*, No. 5:19-CV-999(TWD), 2020 WL 5802272, at *8 (N.D.N.Y.

Sept. 29, 2020) (citing *Frey, supra*; *Little v. Colvin*, No. 14-CV-63(MAD), 2015 WL 1399586, at *9 (N.D.N.Y. Mar. 26, 2015) (state agency physicians are qualified experts whose opinions may constitute substantial evidence when consistent with the record as a whole)).

Plaintiff also argues that the ALJ should not have considered observations of plaintiff's mental status by physicians who were not seen for plaintiff's mental impairment. Plaintiff argues that the fact that she did not always exhibit symptoms of anxiety or depression and was pleasant and cooperative when being examined for her physical impairments should not have been considered by the ALJ when making the disability determination. (Pl.'s Br. at 18-20).

However, the ALJ was simply stating that NP McNally's assessment of the severity of plaintiff's limitations caused by her impairment, as opposed to plaintiff's psychiatric diagnosis, was inconsistent with the evidence in the record. *See e.g. Coley v. Colvin*, No. 6:14-CV-6638 (MAT), 2015 WL 6554982, at *5-6 (W.D.N.Y. Oct. 29, 2015). The ALJ found that plaintiff had severe mental impairments. Plaintiff's condition and behavior at other medical appointments is relevant when she is claiming that she has "marked" restrictions in her activities of daily living and social functioning, and extreme difficulties maintaining concentration, persistence and pace. In addition, the fact that plaintiff denied psychiatric symptoms[16] to some of her other providers is

---

[16] (T. 386-87, 390, 392, 396) (plaintiff denied psychiatric symptoms in October, November, December 2013, and January 2014 to her primary care provider, and during some of these appointments, she denied gastrointestinal problems, musculoskeletal problems, and back pain). In February, March, of 2014, plaintiff reported back pain, but denied GI symptoms and psychiatric symptoms. (T. 399, 402). Physical examination showed moderate tenderness of the low back. (T. 399, 402). In April of 2014, plaintiff told her primary care provider that she exacerbated her back problem

relevant to the extent of plaintiff's restrictions.

In *Jennifer W. v. Comm'r of Soc. Sec.*, No. 5:19-CV-37, 2020 WL 549357, at *14 (D. Vt. Feb. 4, 2020), the court held that a plaintiff's presentation to other providers in which she appeared "in no distress" and did not have difficulty interacting was not inconsistent with her treating psychologist's severe restrictions.  This case is distinguishable, first because NP McNally is not an acceptable medical source, but also because some of the other providers were specifically evaluating plaintiff's psychological condition, even though they were not psychologists or psychiatrists. They were not simply making comments regarding her "presentation." In addition, NP McNally's marked and extreme restrictions were not consistent with her own treatment notes, while the psychologist in *Jennifer W.* went to great lengths to explain the plaintiff's condition and limitations.

The ALJ's RFC accounted for the plaintiff's anxiety by limiting her to "low pressure" work which would not require multi-tasking, detailed job tasks, significant independent judgment, very short deadlines, teamwork, and more than occasional changes in the work setting. (T. 15).  The ALJ also limited plaintiff to only "occasional" interaction with coworkers and supervisors and ***no interaction with the***

---

when she "picked up an air conditioner," but denied psychiatric symptoms. (T. 403).  She continued to complain of back pain, but denied psychiatric symptoms in May, June, July, and August of 2014. (T. 406, 409, 411, 413).  In September of 2014, plaintiff told her primary care provider that she was trying to get a dead branch off of a tree and it fell, injuring her foot. (T. 414).  Once again, she denied psychiatric symptoms, and the objective examination showed appropriate mood and attitude. (T. 415). A follow-up appointment several days later contained the same findings. (T. 417). She again denied psychiatric symptoms to her primary care provider in November of 2014. (T. 419). *See also* (T. 422, 424-25, 427).  All these medical records note that plaintiff suffers from anxiety and list her medications.

*public*. (*Id.*)

## 2. Physical Limitations

The ALJ found that plaintiff could perform light work, without any additional physical restrictions. (T. 15-18).  The ALJ extensively discussed the plaintiff's back impairment and limitations imposed thereby. (*Id.*)  Plaintiff reported back pain, but her physical examinations were generally normal, and other than occasional moderate tenderness in the lumbosacral area,[17] plaintiff had normal, steady gait and station, and full strength. (T. 275, 367, 386, 406, 413, 415, 419, 422, 424, 425, 517).  On November 12, 2013, plaintiff was examined by orthopedic specialist Collin Harris, M.D. (T. 275). Plaintiff had only minimal limitation in the range of motion in both her cervical and lumbar spine.  Plaintiff had full strength in both her upper and lower extremities, and her gait was normal, even though she had "difficulty moving on and off the exam table due to pain." (*Id.*)  Plaintiff had mild tenderness in various parts of her back, but the examination was mostly negative.[18] (*Id.*)  Her "scoliosis exam" showed that the plaintiff was "well balanced in the coronal and sagittal plane. [Her] shoulders are level." (*Id.*) He recommended, inter alia, a course of physical therapy and weight loss. (*Id.*)  This examination is consistent with Dr. Lorensen's consultative examination of April 24, 2017. (T. 367 (gait normal); 368 (minimal limitations in spine range of motion - full

---

[17] On January 14, 2015, plaintiff's physical musculoskeletal examination was within normal limits, there was no tenderness in the back, her upper and lower extremity strength was "intact," she had a "mildly tender" hematoma on her ankle, and her mood and affect were normal. (T. 422). Plaintiff had sprained her ankle, but the pain was resolving. (T. 421).

[18] Dr. Harris also noted that plaintiff's mood was appropriate to the situation, pleasant, and cooperative. (T. 275).

strength, no sensory deficits); 369 (no gross limitations sitting, standing, walking or handling small objects - mild to moderate limitations bending, reaching, and lifting)).

On March 2, 2015, plaintiff still had some ankle pain from her previously sprained ankle, but denied any other musculoskeletal, neurological, or psychiatric symptoms to her primary care provider.[19] (T. 424).  The objective examination was within normal limits, including the "Psych" category. (T. 425).  March 18, 2016 was plaintiff's last visit to Chittenango Medical and Wellness because she was transferring to a new provider. (T. 426).  During that visit, plaintiff ***denied*** gastrointestinal, musculoskeletal, neurologic, and psychiatric symptoms. (T. 426-27).  Her physical examination was within normal limits, and she was noted as having "appropriate" attitude and euthymic mood. (T. 427).

Plaintiff switched primary care providers and began treating with Dr. Stephanie Clapper at CNY Family Care, PC. (T. 437-95).  Dr. Clapper's first progress note stated that plaintiff exhibited anxiety and depression through the encounter. (T. 438).  Plaintiff described her mood as anxious and depressed. (*Id.*)  Dr. Clapper stated that a lot of plaintiff's pain was due to her anxiety issues. (T. 439).  She encouraged plaintiff to do physical therapy for her back, but plaintiff declined. (T. 440).  On July 16, 2017, plaintiff went to Crouse Hospital after she had an allergic reaction to her blood pressure medication, but denied any nausea or vomiting. (T. 451).  She was on vacation, camping at the time. (*Id.*)  Plaintiff was treated for the reaction and spent the night in the hospital on observation, but was discharged the next day. (T. 455).  On July 25,

---

[19] At that time, plaintiff's primary care provider was Chittenango Medical and Wellness Assoc., PC.

2017, plaintiff went to CNY Family Care for a follow-up after the allergic reaction. (T. 457).  Plaintiff told a physician assistant that she was going through a lot, and that the family had to leave camp because her brother had a medical issue, and reported "anxiety and stress." However, she also stated that she was returning to "camp" the next day. (*Id.*)  Plaintiff reported nausea, but denied vomiting. (*Id.*)  Objectively, plaintiff was cooperative, had a normal affect, but was "anxious." (T. 458).

On September 27, 2017, plaintiff developed shoulder pain after falling down the stairs. (T. 467).  At that time, plaintiff was seen by another physician assistant and denied nausea and vomiting. (*Id.*)  X-rays of her shoulder were normal. (T. 471).  On October 11, 2017, plaintiff saw Dr. Clapper.  Although initially, plaintiff reported some diarrhea, she later denied any GI symptoms, including nausea and vomiting. (T. 472).  She still had pain in her right shoulder, but did not report any back pain or other musculoskeletal issues. (*Id.*)  She was reported as having anxiety, but had a pleasant and cooperative attitude with normal mood. (T. 474).  Her judgment and insight were "grossly intact." (*Id.*)  Plaintiff was advised to exercise to improve her mood.[20] (*Id.*)

On February 2, 2018, plaintiff went to her primary care provider to follow up for her blood pressure and diabetes. (T. 485).  Plaintiff explained that she was filing for social security benefits based on her anxiety and depression and that NP McNally was "handling that," but believed that her primary care provider should be filling out paperwork as well. (*Id.*)  Plaintiff denied any GI symptoms at that time, including

---

[20] Plaintiff had been diagnosed with diabetes, and her primary care providers were attempting to manage this impairment as well. (T. 475).  Exercise "as tolerated" was encouraged as part of plaintiff's treatment. (*Id.*)

nausea and vomiting.  She still complained of right shoulder problems, but did not mention her back or any pain related to her scoliosis. (*Id.*)  Upon physical examination, plaintiff showed mild tenderness in her trapezius and her biceps, but had full range of motion. (T. 486-87).  On June 5, 2018, plaintiff reported GI symptoms, including nausea and vomiting. (T. 492).  Plaintiff underwent a diabetic foot examination, but there was no discussion of her back. (T. 493).

In addition to limiting plaintiff to light work, the ALJ accommodated plaintiff's potential need to use the bathroom if she became nauseated or needed to vomit. (*Id.*)  The ALJ stated that plaintiff's need to use the bathroom could be accommodated by the 15 minute morning and afternoon breaks, the 30 minute lunch period "***and two additional 10 minute breaks***."[21]

## VII.   Evaluation of Symptoms

### A.    Legal Standards

In evaluating a plaintiff's RFC for work in the national economy, the ALJ must take the plaintiff's reports of pain and other symptoms into account. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  The ALJ must "'carefully consider'" all the evidence presented by claimants regarding their symptoms, which fall into seven relevant factors including 'daily activities' and the 'location, duration, frequency, and intensity of [their] pain or other symptoms.'" *Del Carmen Fernandez v. Berryhill*, No. 18-CV-326, 2019 WL 667743, at *9 (S.D.N.Y. Feb. 19, 2019) (citing 20 C.F.R. § 404.1529(c)(3);

---

[21] Although plaintiff testified that she never knew when she would feel ill, she testified that she could vomit up to three times in one day. (T. 45).  The ALJ accounted for this possibility with the amount of breaks that he factored into the RFC.

SSR 16-3p, *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, 81 FR 14166-01 at 14169-70, 2016 WL 1020935 (Mar. 16, 2016)).

In 2016, the Commissioner eliminated the use of term "credibility" from the "sub-regulatory policy" because the regulations themselves do not use that term. SSR 16-3p, 81 FR at 14167. Instead, symptom evaluation tracks the language of the regulations.[22] The evaluation of symptoms involves a two-step process. First, the ALJ must determine, based upon the objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).

If so, at the second step, the ALJ must consider "'the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the [objective medical evidence] and other evidence to decide how [the claimant's] symptoms affect [her] ability to work.'" *Barry v. Colvin*, 606 F. App'x 621, 623 (2d Cir. 2015) (citing inter alia 20 C.F.R. § 404.1529(a); *Genier v. Astrue*, 606 F.3d at 49) (alterations in original).[23] If the objective medical evidence does not substantiate the claimant's symptoms, the ALJ must consider the other evidence. *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (citing superceded SSR 96-7p). The ALJ must assess the

---

[22] The standard for evaluating subjective symptoms has not changed in the regulations. Rather, the term "credibility" is no longer used, and SSR 16-3p makes it clear that the evaluation of the claimant's symptoms is not "an evaluation of the claimant's character." 81 FR at 14167. The court will remain consistent with the terms as used by the Commissioner.

[23] The court in *Barry* also cited SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996), which was superceded by SSR 16-3p. As stated above, the factors considered are the same under both rulings. The 2016 ruling has removed the emphasis on "credibility."

claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

The ALJ must provide specific reasons for the determination. *Cichocki v. Astrue*, 534 F. App'x at 76.  However, the failure to specifically reference a particular relevant factor does not undermine the ALJ's assessment as long as there is substantial evidence supporting the determination. *Id. See also Del Carmen Fernandez v. Berryhill*, 2019 WL 667743 at *11 (citing *Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 744 (S.D.N.Y. 2018)).  "[R]emand is not required where 'the evidence of record allows the court to glean the rationale of an ALJ's decision.'" *Cichocki v. Astrue*, 534 F. App'x at 76 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)).

### B.   Analysis

After his analysis of the medical records, the ALJ concluded that, with respect to plaintiff's physical impairments, she could perform "light work." (T. 18).  Specifically, he found that the diagnostic studies, clinical findings during examinations, the plaintiff's treatment history, and her activities of daily living did not support the plaintiff's allegations regarding the severity of her condition. (*Id.*)  Plaintiff argues that

the ALJ mischaracterized plaintiff's daily activities, and that she only performed these activities sporadically or with assistance from others.[24]

The ALJ's findings regarding the medical evidence are supported by substantial evidence.  With respect to plaintiff's daily activities, once again, the ALJ was presented with conflicting evidence.  Plaintiff's function report, signed on April 17, 2017 stated that she could cook, depending on how she felt, and she could do housework and laundry "if not sick." (T. 222).  The ALJ did cite this report when he stated that plaintiff was "able to do chores, such as cleaning and laundry, without any assistance." (T. 18). While plaintiff did qualify her statement with "if not sick," she did not state that she needed assistance with those tasks when she could perform them.  In addition, she told Dr. Lorensen on April 24, 2017 that

> She cooks, cleans, and does laundry as necessary.  Her parents do the shopping.  She showers and dresses daily.  She watches TV, listens to the radio, and socializes.

(T. 367).  There were no qualifying statements in Dr. Lorensen's report.  Even if the evidence can be considered conflicting, and even if the ALJ's characterization of the plaintiff's function report contained some error,[25] the ALJ's ultimate conclusion that plaintiff could perform the physical requirements of light work, rejecting plaintiff's claimed additional limitations is supported by substantial evidence.

The ALJ's analysis regarding plaintiff's mental symptoms is similarly supported. As stated above, the ALJ mentioned that plaintiff did not exhibit severe symptoms at

---

[24] Plaintiff states that the ALJ "grossly misquotes" the function report that he cites for this proposition. (Pl.'s Br. at 19) (citing T. 17-18, 222, 226, 367).

[25] Any such error would be harmless, based on the remainder of the record.

many of her medical appointments, sometimes denying psychiatric symptoms altogether.  In her function report, plaintiff stated that she had "no" trouble paying attention, and that she could follow written and spoken instructions. (T. 226, 227, 229).  Although she stated that "sometimes," she need to be reminded of things, none of her mental examinations indicated that plaintiff had any severe memory impairment.  As stated above, plaintiff often denied symptoms to some of her other providers, and occasionally described activities that were inconsistent with her stated limitations, both physical and mental.[26]

The court notes that on July 16, 2017, plaintiff visited the emergency room at Crouse Hospital. (T. 451).  Plaintiff had an allergic reaction to a new blood pressure medication she had taken.  However, in the narrative report, the physician stated that plaintiff told him that she had gone "on vacation" in a rural area and was "out celebrating her time off and went to bed at 5 AM this morning . . . ." (*Id.*)  She woke up at 3:00 p.m. with swollen lips.  Plaintiff also stated that she had a slight headache, but that could have been because she had been drinking the night before. (*Id.*)  Plaintiff denied any nausea or vomiting.  Although plaintiff was admitted for observation, even though she did not want to stay. (T. 452).  She was discharged the next day and saw Dr. Clapper the following week on July 25, 2017.  She told Dr. Clapper that she "was going through a lot" and that they had to leave camp suddenly because her brother had a seizure. (T. 457).  She left her medications at the camp site.  She reported anxiety and stress, but told Dr. Clapper that she was returning to "camp" the next day and could

---

[26] (T. 403 -picking up air conditioner, 414 - getting dead branch out of a tree, 451- camping).

retrieve her medications then. (*Id.*)  Although the ALJ found that plaintiff had severe impairments, her daily activities, together with the medical evidence of record did not support the extent of the restrictions that she alleged and that NP McNally found in her 2018 report.[27]

WHEREFORE, based on the findings above, it is

ORDERED, that the decision of the Commissioner is **AFFIRMED** and this case is **DISMISSED**, and it is

ORDERED, that the Clerk enter judgment for **DEFENDANT**.

Dated: August 2, 2021

Andrew T. Baxter
U.S. Magistrate Judge

---

[27] The court also notes that although plaintiff testified that she had some side effects from her medications, and she has had some adverse reactions to medications that were discontinued or adjusted, plaintiff consistently reported either that her medications were working well or that she had no side effects from her medications. *See e.g.* (T. 229, 294, 345-48, 363, 395, 398, 401, 405, 408, 416, 421, 424, 426).